# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VIATECH TECHNOLOGIES, INC. | ) | C.A. No. 19-11177-ADB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ADOBE INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>VIATECH TECHNOLOGIES, INC.'S OPPOSITION TO ADOBE INC.'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS .................................................................................. 3

        A.      The Specification Identifies Shortcomings in the
                Relevant Computer Arts ........................................................................ 3

        B.      The Patent Claims Specific Improvements to Computer
                Technology .............................................................................................. 5

III.    THE VIATECH PATENT IS PATENT-ELIGIBLE ........................................... 7

        A.      The Two-Prong Test for Eligibility ...................................................... 7

        B.      The Claims of the ViaTech Patent Are Not Abstract
                (Step One) .............................................................................................. 8

                1.      The '567 Patent Claims Improvements to
                        Computer Technology, Rendering the Inventions
                        "Non-Abstract" ........................................................................... 9

                2.      Adobe's Step One Arguments Ignore Controlling
                        Precedent, The Patent's Detailed Specification,
                        and the Claims Themselves ...................................................... 12

        C.      Whether the Patent Claims Are Conventional Raises At
                Least A Factual Question (Step Two) ................................................ 14

        D.      Other Claims Are Patentable for Additional Reasons ................... 19

IV.     CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ................................................................. 15

*Alice Corp. Pty. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ...................................................................... passim

*Allconnect, Inc. v. Consumer Brands, LLC*,
  No. CV 18-5959-DOC (JDEx), 2018 WL 7377934 (C.D. Cal.
  Dec. 14, 2018) .......................................................................... 15

*Amdocs (Israel) Ltd. v. Openet Telcom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) ................................................................. 16

*American Well Corp. v. Teladoc, Inc.*,
  191 F. Supp. 3d 135 (D. Mass. 2016) ........................................................... 13

*Ancora Techs., Inc. v. HTC America, Inc.*,
  908 F.3d 1343 (2018) ................................................................ 8, 10, 13

*Axcess Int'l, Inc. v. Genetec (USA) Inc.*,
  375 F. Supp. 3d 533 (D. Del. 2019) ............................................................ 11

*Bascom Global Internet Svcs, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ............................................................. 15, 16

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018) ............................................................. 15, 18

*Blue Spike, LLC v. Google, Inc.*,
  No. 14-CV-01650-YGR, 2015 WL 5260506 (N.D. Cal. Sept. 8,
  2015) ............................................................................. 17

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed Cir. 2019) ............................................................... 15

*Contentguard Holdings, Inc. v. Amazon.com, Inc.*,
  142 F. Supp. 3d 510 (E.D. Tex. 2015) ......................................................... 11

*Core Wireless Licensing S.A.R.L. v. LG Elecs, Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018) .............................................................. 8, 12

Plaintiff's Opposition to Defendant's Motion to Dismiss

*Data Engine Techs. LLC v. Google LLC,*
    906 F.3d 999 (Fed. Cir. 2018) ................................................................... 8, 12

*DataTern, Inc. v. Microstrategy, Inc.,*
    No. CV 11-11970-FDS, 2015 WL 5190715 (D. Mass. Sept. 4,
    2015) ................................................................................................................ 9

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    773 F.3d 1245 (Fed. Cir. 2014) ....................................................... 8, 10, 12

*Digital Media Techs., Inc. v. Hulu, LLC,*
    No. 4:16cv245-MW/CAS, 2017 WL 4750705 (N.D. Fla. July 3,
    2017) ............................................................................................................. 18

*Enfish, LLC v. Microsoft Corp.,*
    822 F.3d 1327 (Fed. Cir. 2016) ...................................................... passim

*Finjan, Inc. v. Blue Coat Systems, Inc.,*
    879 F.3d 1299 (Fed. Cir. 2018) ...................................................... passim

*JDS Techs., Inc. v. Exacq Techs.,*
    No. 15-10387, 2016 WL 3165724 (E.D. Mich. June 7, 2016) .................... 11

*MAZ Encryption Techs. LLC v. Blackberry Corp.,*
    No. CV 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29,
    2016) ...................................................................................................... 11, 16

*McRo, Inc. v. Bandai Namco Games Am. Inc.,*
    837 F.3d 1299 (Fed. Cir. 2016) .................................................................. 8

*Paone v. Broadcom Corp.,*
    No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279 (E.D.N.Y.
    August 19, 2015) ................................................................................... 11, 14

*Pure Data Systems, LLC v. Ubisoft, Inc.,*
    329 F. Supp. 3d 1054 (N.D. Cal. 2018) .................................................... 15

*Smartflash LLC v. Apple Inc.,*
    80 F. App'x 977 (Fed Cir. 2017) ............................................................. 12

*Umbanet, Inc. v. Epsion Data Mgmt., LLC,*
    263 F. Supp. 3d 647 (E.D. Tex. 2017) ...................................................... 17

*Veracode, Inc. v. Appthority, Inc.,*
    137 F. Supp. 3d 17 (D. Mass. 2015) ........................................................... 8

Plaintiff's Opposition to Defendant's Motion to Dismiss

*ViaTech Techs. Inc. v. Microsoft Corp.*,
    733 F. App'x 542 (Fed. Cir. 2018) ............................................................... 2, 4, 5, 14

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
    No. 17-cv-03848-RS, 2018 WL 2585436 (N.D. Cal. May 8,
    2018) .......................................................................................................................... 15

## **STATUTES**

35 U.S.C. § 101 ....................................................................................................... 7, 9, 14

Plaintiff's Opposition to Defendant's Motion to Dismiss

## I.      INTRODUCTION

Preventing unauthorized access to digital content and programs, today known as digital rights management (DRM), is an important aspect of computing technology. Ever evolving techniques for software and content piracy continue to drive the need for innovation in this critical area. Indeed, Adobe itself continues to invest substantial resource in the area of DRM.[1]  For example, Adobe's U.S. Patents 8,793,492 (Methods and Systems for Scalable Distribution of Protected Content), 8,739,298 (Method and System for enforcing a license dependency rule for a software application), and 8,667,605 (Method and system for determining the eligibility for deploying protected content) are all directed to methods of protecting digital content (and include claims much less detailed than the patent at issue here).[2]

A cursory review of these patents reveals the disingenuous and opportunistic nature of Adobe's motion.[3]  For example, Adobe's '492 patent, like the patent at issue here, is directed to protecting content using an "embedded license," but was not filed until 2011—twelve years after the asserted ViaTech patent, U.S. Patent No. 6,920,567 (the '567 Patent).  And Adobe's '492 patent contains method claims (and other claims) for accessing licensed content utilizing an embedded license (*see, e.g.*, claim 15).  To obtain these patents (and its many other DRM patents), Adobe swore to the United States Patent and Trademark office that their claimed subject matter was

---

[1] A Google Patents search for Adobe patents relating to DRM returns 166 pending or issued patents in just the United States.
https://www.google.com/search?tbo=p&tbm=pts&hl=en&q=DRM+inassignee:adobe&num=10.
[2] *See* Complaint ¶¶ 41-43 (citing Adobe patents and describing Adobe's knowledge of ViaTech's '567 patent). The Adobe patents are attached as Exhibits A-C to the Declaration of Michael Zachary ("Zachary Decl.").
[3] Microsoft Corporation similarly has filed and obtained many patents in the DRM field. Microsoft is the Defendant in another action on this patent and, notwithstanding years of litigation and the current Section 101 landscape, in which nearly every defendant in every computer-related patent case files a motion under Section 101 hoping to exploit the confusion that has resulted from *Alice* and its progeny, Microsoft never raised a 101 challenge to the ViaTech patent.

eligible for patent protection.  Adobe can't reconcile its own representations to the USPTO with its allegations that the ViaTech patent is directed "nothing more than the abstract concept of protecting licensed content." That Adobe now likens the '567 patent, the ***first*** patent with an "embedded license mechanism," to chaining books to benches in the Vatican's Apostolic Library borders on the absurd.

Adobe's contentions here are likewise belied by how it described the '567 patent to the USPTO in statements made to obtain its own DRM patents. Adobe was forced to *overcome* the ViaTech '567 Patent, which was cited as prior art by the Examiner, and discussed the patent in detail in over a year of interactions with the Patent Office, ultimately requiring Adobe to amend its own claims to avoid the detailed descriptions in the ViaTech patent cited by Examiner. Indeed, in responses to the Examiner's rejections, Adobe acknowledged the various technical features of the ViaTech '567 patent in a manner that is inconsistent with the positions Adobe advances now.[4] On this basis alone, it is evident Adobe's position is without merit. The ViaTech patent claims patent-eligible subject matter, and Adobe knows it, based at the very least on its own efforts to overcome ViaTech's important and early DRM patent.[5]

Even the Federal Circuit has weighed in on the technical improvements of ViaTech's DRM patent over the prior art techniques. As discussed below, the Federal Circuit described in detail the important and specific improvements claimed in the ViaTech patent. *ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 544 (Fed. Cir. 2018). Although the introduction to Adobe's motion introduction spins an engaging yarn—that is all it is. For the reasons set forth below, Adobe's motion should be denied.

---

[4]  Ex. D (file history excerpt including Adobe's initial response dated Nov. 27, 2012).

[5]  Attesting to the seminal nature of the ViaTech advance, the ViaTech patent has been cited in the examination of 298 patents, including these three Adobe patents.  Exs. A-D; *see also* Ex. E (Google Patents "Cited By" listing).

Plaintiff's Opposition to Defendant's Motion to Dismiss

## II.    STATEMENT OF FACTS

In April 1999 when the application for the '567 Patent was filed, available DRM technology was sparse. Software and content providers were just beginning to understand the difficulties involved in protecting their products downloaded through the Internet. Indeed, the now-infamous Napster appeared on the scene in June 1999. The problem was, therefore, immediate and pressing. As discussed in the patent, the known solutions were seriously flawed.[6]

At this time, ViaTech was in the business of developing custom software applications. ViaTech needed to protect those applications from unauthorized use and dissemination. The lack of suitable protection mechanisms inspired ViaTech not only to develop novel mechanisms to protect their own applications, but also a product that could protect anyone's software or digital content. Complaint ¶¶ 11-13. ViaTech's '567 patent is directed to specific and novel ways to protect licensed, digital content files (such as software, movies and songs) to prevent piracy and unauthorized use. ViaTech built a business around its patented solution, and today continues to license its "eLicense" anti-piracy software—referred to in the patent—to software developers, PC Game developers, and digital publishers, among others. Complaint ¶¶ 11-17.

### A.    The Specification Identifies Shortcomings in the Relevant Computer Arts

The ViaTech patent begins by describing a "*problem in computer systems*," in particular, the distribution and control of licenses for use of digital content files, a problem exacerbated by the then-recent advent of purchase and distribution of electronic content over the internet. 1:17-23.[7] "The '567 patent describes and claims systems and methods for distributing digital content

---

[6] Adobe's own early efforts were widely regarded as a "spectacular failure." *See* https://www.csulb.edu/journals/jecr/issues/20033/paper3.pdf at p. 102. Indeed, by Adobe's own contemporary admission: "PDF cannot enforce the document access privileges specified in the encryption dictionary." Guignard, B., "How secure is PDF?," 2003, http://www.cs.cmu.edu/~dst/Adobe/Gallery/PDFsecurity.pdf at p.3.

[7] This and similar citations in the brief refer to the numbered columns and line(s) in the '567 Patent.

Plaintiff's Opposition to Defendant's Motion to Dismiss

files and controlling the licensed use of digital content included in those files. *See, e.g.*, '567 Patent, Abstract." *See ViaTech v. Microsoft*, 733 F. App'x at 544.

The patent describes in some detail six different prior art approaches and their deficiencies. For example, in one system, the protection was offered at the media level, which meant that protection for all of the content on the disk was unlocked at the same time. In addition, the protection mechanism required a file manager program that interacted with the file system and could only unlock the media; thus, the system only had on/off protection—once the content was unlocked, it was thereafter always available to the user. 1:45-65. Another system permitted only enterprise-wide use—content was locked or unlocked on an enterprise-wide basis and the form of the license was static—it could not be updated or modified. 2:12-19. Yet another system limited who could authenticate the software and also had only on/off protection. 2:32-36; *see also* 2:37-3:36 (critiquing other systems). The patent summarizes the limitations of the prior art as follows: (1) "the systems of the prior art generally rely upon mechanisms that are separate and independent from a licensed program, rather than a means that is related to the program itself, thereby providing only limited protection and being readily vulnerable to various methods for bypassing such forms of protection;" (2) "the systems of the prior art are essentially static, that is, they do not allow a license to be subsequently modified at need, and frequently provide only one-time protection;" and (3) "the systems of the prior art severely limit the types of systems in which the programs and licensing enforcement mechanisms may be employed, and the means by which the licensed programs and licenses may be distributed." *Id.* at 3:37-51.[8]

---

[8] The limitations of the prior art that the '567 claims overcame were also succinctly described by the Federal Circuit: "Prior art systems relied on licensing mechanisms that were separate and independent from the licensed content and had no effective functional relationship to the licensed program. *Id.* at col. 3, ll. 37–44. As a result, the licensed content was "vulnerable to various methods for bypassing such forms of protection." *Id.* at col. 3, ll. 43– 44. In addition, the licenses

(continued…)

### B.     The Patent Claims Specific Improvements to Computer Technology

The Federal Circuit previously summarized the '567 patent's improvements:

> Addressing these disadvantages, the '567 patent describes and claims a "digital content file" that comprises a "file access control mechanism" including a "dynamic license database." *Id.* at col. 3, l. 53–col. 4, l. 1. The file access control mechanism is embedded either physically or functionally, in the digital content file, and controls access to digital content based on the terms of the content's corresponding license. *Id.* at col. 15, ll. 12–44. The database stores (1) the license terms and provisions which control access to the digital content of the file, and (2) the information controlling operations of the file access control mechanism. *Id.* at col. 3, l. 53–col. 4, l. 14.

*ViaTech v. Microsoft*, 733 F. App'x at 544.

ViaTech's innovations are reflected in the claims of the '567 patent and comprise quintessential examples of practical improvements to computer technology that are patent eligible. Some of its many claimed improvements to content protection technology include: (1) *embedding specified license control mechanisms **in** the digital content files themselves*, which ensured that license information was always distributed with each protected content rather than kept externally to the files, as in the prior art, which was easy to circumvent; (2) providing a mechanism to *communicate license definition information* to the *dynamic license database* so that the license terms could be modified, unlike the static licenses of the prior art systems; (3) devising a method for *monitoring and ensuring license compliance over time* instead of only the first time that the user obtained the software/content; and (4) *tying the license control mechanisms to adaptive "fingerprints"* of the hardware and software of the end-user's system, so that if the user's system is modified beyond a specified tolerance, use or access may be restricted in accordance with the license terms.  These claimed innovations are supported by over 40 columns of detailed disclosures in the specification. The patent claims an improvement to the computer technology for protecting

---

could not subsequently be modified once granted and the content became fully accessible to the user system. *Id.* at col. 3, ll. 44–52." *ViaTech v. Microsoft*, 733 F. App'x at 544.

Plaintiff's Opposition to Defendant's Motion to Dismiss

digital content.

Claim 1 recites the elements of an improved "digital content file." Portions reflecting some of the innovations detailed in the specification are bolded:

> 1. A digital content file including a license control mechanism for controlling the licensed use of digital content, comprising:
> a digital content, and
> an embedded **file access control mechanism embedded in the digital content file**, including
> a **license functions mechanism embedded in the digital content file** and including
> a **license monitor and control mechanism** communicating with a dynamic license database and monitoring use of the digital content by a user **to determine whether a use of the digital content by a user compiles with the license** defined in the dynamic license database, and
> a **license control utility** providing communications between a user system and an external system **to communicate license definition information between the user system and the external system**, including
> a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism, and
> the **dynamic license database** wherein the dynamic license database is associated with the digital content file **for storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content**.

Claim 1 recites a File Access Control Mechanism *embedded* in the Digital Content File ("DCF"), which communicates with the *dynamic* (modifiable) license database that includes the license terms for controlling licensed use. These are among the improvements in the field of content protection that the patent states were not conventional. 1:17-23; 1:45-65; 2:12-19; 2:32-36; 2:37-3:36; 3:37-51; 3:52-53.

The specification provides detailed support for all of these and other innovations. The specification details the innovations of embedding the license control mechanisms in the DCF (10:45-49; 12:35-47; 13:59-65; 16:5-25; 19:27-40), monitoring and controlling use of the DCF, (10:53-61; 13:59-65; 17:11-62; 19:55-20:3), and tying the specific user system to the DCF (11:31-34; 24:34-26:4). The specification also describes in detail an exemplary "dynamic license

Plaintiff's Opposition to Defendant's Motion to Dismiss

database" ("DLD") which can be modified dynamically to change the license terms—e.g., if a license term is extended. 20:31-22:46. The system is "independent of any specific distribution or ecommerce method, and supports any type of licensing model," something "not accommodated by conventional . . . systems." 11:55-62.

## III.   THE VIATECH PATENT IS PATENT-ELIGIBLE

### A.   The Two-Prong Test for Eligibility

The Patent Act provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, *or any new and useful improvement thereof*, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. While the statute admits of no exceptions, the Supreme Court has held that "abstract ideas" are not patentable under § 101. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The "abstract idea" exception, however, should not be read so broadly as to "swallow all of patent law," because at a high level "all inventions" are directed to abstract ideas. *Id.* at 217. Rather, the concern is about preemption: claiming exclusive rights to "fundamental truths" or "fundamental economic practice[s]," *id.* at 219-220, such as algorithms to convert decimal numbers to binary form, mathematical formulas, and hedging economic risk, *id.* at 218-219, 221.

In *Alice*, the Court set forth a two-part test for determining the patent eligibility for inventions asserted to be "abstract ideas." First, "we determine whether the claims at issue are directed to one of those patent-ineligible concepts." Second, if so, the Court determines whether the claimed invention is something more than a "conventional" application of the otherwise unpatentable concept. *Alice*, 573 U.S. at 217-218.

Claims that "purport to improve the functioning of the computer itself" or that "effect an improvement in any other technology or technical field" are patentable. *Id.* at 225.

**B.    The Claims of the ViaTech Patent Are Not Abstract (Step One)**

In applying Step One of *Alice*, courts should "first examine the [] patent's 'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018); *see also McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (internal quotations omitted).

Echoing *Alice*, the Federal Circuit has repeatedly held that inventions "rooted in computer technology" or that represent an "improvement" to computer technology are not abstract. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257, 1259 (Fed. Cir. 2014) (patent improved computer technology by providing specific way to retain website visitors on host's website even while user clicked on link to a different site); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1330-32, 1338-39 (Fed. Cir. 2016) (specific new way of organizing a database was an improvement to computer technology); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-06 (Fed. Cir. 2018) (improvement because "the claims . . . recite specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result"); *Core Wireless Licensing S.A.R.L. v. LG Elecs, Inc.*, 880 F.3d 1356, 1362-3 (Fed. Cir. 2018) ("particular manner of summarizing and presenting information in electronic devices" was an improvement to computer technology); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007-09 (Fed. Cir. 2018) (using electronic tabs to navigate spreadsheets was a "specific solution" to a then-existing problem); *Ancora Techs, Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348-49 (Fed. Cir. 2018) (securing a product license by placing a verification mechanism in the BIOS, which "specifically identifies how [a] functionality improvement is effectuated"); *see also Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 49-54 (D. Mass. 2015) (problem of translating source code

to binary code was unique to computers; iterative translation method claimed in patent was not abstract); *DataTern, Inc. v. Microstrategy, Inc.*, No. CV 11-11970-FDS, 2015 WL 5190715, at *6 (D. Mass. Sept. 4, 2015) (mapping object-oriented software program to relational database "rooted in computer technology")

### 1.    The '567 Patent Claims Improvements to Computer Technology, Rendering the Inventions "Non-Abstract"

As Adobe itself has admitted when attempting to overcome the patent as prior art, the '567 patent is not directed to some well-known process implemented via a computer. Rather, the claims recite specific improvements to computer technology itself, such as the structure of a file that is protected in accordance with the "present invention." Claim 1, for example, is directed to a digital content file (DCF) that (1) has an *embedded* File Access Control Mechanism and License Functions Mechanism that determines whether the user is in compliance with the content license, and that (2) is in communication with a dynamic license database which may be resident in the digital content file, and that can be modified to update license information.[9] This description of Claim 1 focuses on the "claimed advance," not the 30,000-foot description now proposed by Adobe ("controlling access to licensed content"), which would render any claim abstract if accepted as the applicable inquiry. *Finjan*, 879 F.3d at 1303 (focus on "claimed advance"); *Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.").

Adobe's attempt to portray the subject matter of the '567 Patent as abstract demonstrates the fallacy of Adobe's motion. If Adobe's abstraction scheme were accepted, the ancient chains of the Vatican's Apostolic Library would render its three DRM patents mentioned above and all other

---

[9] Although Adobe's contention that Claim 1 is "representative" is incorrect (*see* Part III.D, *infra*), to the extent Claim 1 is held to be patentable, the other claims are patentable for at least the same reasons.

content protection inventions—such as modern-day advances like magnetic anti-theft tags and library self-checkout systems—as "patent ineligible." Under controlling precedent there is nothing abstract about the innovation of embedding content control mechanisms within a DCF (a thing), having a dynamic (modifiable) license database (also a thing) that enables the ability to modify licenses, and monitor access to content even after initial licensing. *See, e.g.*, *DDR* at 1249-50 (upholding claims to a "data store" and a "processor," and to a "computer store" with "web pages" and a "server," all having specified functions).

The claims of the ViaTech patent are highly similar to those upheld in *Ancora* and *Finjan*. *Ancora*, like this case, involved a licensing control/content protection mechanism. There, the claimed innovation embedded the verification structure "in the erasable, non-volatile memory of the BIOS," then verified the content license using the verification structure embedded in the BIOS.[10] 908 F.3d at 1346. This was in contrast to prior software mechanisms in which the verification structure was placed on the computer hard drive or other memory locations, which were much easier to hack.  *Id*. at 1345, 1348-49.  The Court held that the novel placement of the verification structure in the BIOS to prevent unauthorized use, similar to ViaTech's novel placement of the license control mechanisms in the digital content files to prevent unauthorized use, was not abstract. "Improving security—here against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1348.

*Finjan* involved a different type of content-protection. In *Finjan*, the claimed advance was the attachment of a "security profile that identifies suspicious code" to a Downloadable, defined as "an executable application program, which is downloaded from a source computer and run on

---

[10] BIOS refers to the Basic Input-Output System of a computer, triggered whenever a computer is booted up. *See* https://whatis.techtarget.com/definition/BIOS-basic-input-output-system.

the destination computer." While the concept of "virus scanning" was conventional, attaching such a security profile *to the Downloadable* "communicate[d] granular information about potentially suspicious code" and provided better protection. As such, the invention was not abstract. Like the patent in *Finjan*, Claim 1 of the ViaTech patent offers better protection for content by installing content-protection mechanisms directly *into the content file* to be protected.

Several district courts have also upheld content-protection claims. In *JDS Techs., Inc. v. Exacq Techs.*, No. 15-10387, 2016 WL 3165724 (E.D. Mich. June 7, 2016), the patent protected against the unauthorized use of video surveillance software through the use of a specific computer address stored at authorized servers. This decentralized placement of the addresses on the servers was the claimed innovation. The patent was found to be non-abstract. *Id.* at *3-4, 6-9 ("de-centralized MAC address licensing to prevent piracy and abuse of … video surveillance software"). *See also Contentguard Holdings, Inc. v. Amazon.com, Inc.*, 142 F. Supp. 3d 510, 516-17 (E.D. Tex. 2015) (patents on content "usage rights" not abstract at least because they required use of devices and systems having specified characteristics); *Paone v. Broadcom Corp.*, No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279 (E.D.N.Y. August 19, 2015) (encryption method using specified methodology not abstract); *MAZ Encryption Techs. LLC v. Blackberry Corp.*, No. CV 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29, 2016) (new way of using encryption technology not abstract); *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533 (D. Del. 2019) (specific method using RFID and video to monitor property not abstract).

Claim 1 represents a clear improvement to computer technology. The Federal Circuit has affirmed that not only hardware, but also "[s]oftware can make non-abstract improvements to computer technology." *Ancora*, 908 F.3d at 1347 (citations omitted); *see also Enfish*, 822 F.3d at 1339 ("Much of the advancement made in computer technology consists of improvements to software . . . ."). As discussed above, the patent describes the many problems with then-existing

technology, such as the inability to protect individual programs rather than the media for those programs, the inability to modify licenses, and the inability to monitor and control use after initial licensing. The patent improved upon the prior art systems by the specific claimed innovations, including embedding protection mechanisms *in the digital files themselves*, modifiable license databases, and license checking and control mechanisms. '567 patent, cols. 1-3. This is the same type of innovation that the Federal Circuit found to represent a patent-eligible improvement to technology in *Ancora* and *Finjan*.

The ViaTech patent does not claim exclusive rights over a "fundamental truth" or a "fundamental economic practice." Nothing about the patent precludes others from finding or using other methods of protecting electronic content, or indeed, from using the prior art methods discussed in the patent. And Claim 1, the only claim addressed in detail by Adobe, identifies a specific way to achieve a desired result (rather than claiming only the result), placing it squarely within a long line of software claims deemed patent-eligible by the Federal Circuit. *See, e.g., DDR Holdings*, *Enfish*, *Core Wireless*, *Data Engine* (each discussed above).

### 2.    Adobe's Step One Arguments Ignore Controlling Precedent, The Patent's Detailed Specification, and the Claims Themselves

Adobe's motion depends on its attempt to portray DRM technology, in general, as abstract. Like a self-fulfilling prophecy, Adobe's argument rests on the gross abstraction of the problem to be solved, "the basic, human concern of providing information only to those who have . . . the right to access it," and the unsupported conclusion that Claim 1 is written in overly-broad, functional language. Br. at 10, 12. Adobe ignores the law and the facts.

Adobe's motion leads with an attempt to force the '567 patent into the Federal Circuit's approach in *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977 (Fed Cir. 2017), to suggest that content protection patents, in general, are abstract and ineligible. But *Smartflash* was, at best, only

tangentially related to content protection, and Adobe's citation to this non-precedential opinion is telling given that Adobe chose not to address in detail the Federal Circuit's *precedential* decisions in *Ancora* and *Finjan* (discussed above), each of which is directly on point. *Smartflash* is distinguishable in any event because the claims were directed to the basic practice of requiring payment to obtain content, sometimes additionally requiring the application of a vague "use rule." Those claims violated *Alice*'s prohibition against patenting economic practices and saying "apply it" on a computer. *Id.* at 982. In contrast, as in *Ancora*, ViaTech's claims do not merely "apply" content-protection on a computer, but detail a technical improvement, including by *locating* a protective mechanism in a non-conventional place. Indeed, Adobe essentially ignores this key improvement, simply asserting at the end of a paragraph that "[t]he 'embedded' access control mechanism likewise works no computer improvement, since its purported advance is just ensuring license compliance." Br. at 13. This circular statement inappropriately recasts the goal of the invention as the invention itself, ignoring the detail provided in the claims and the specification. Adobe furnishes no evidence that embedding the control mechanisms in the DCF is not an improvement, and the evidence of record—the patent itself—is to the contrary. Adobe's citation to the footnote in *American Well Corp. v. Teladoc, Inc.*, 191 F. Supp. 3d 135, 145, n.5 (D. Mass. 2016) is inapposite; the patent claim under discussion there recited using a computer to allow a patient to choose and communicate with a doctor.

Contrary to Adobe's assertion, the claims also do not "merely assign[] labels to generic functions," and hence the cases it cites on this issue are inapposite. Br. at 3.[11] Adobe simply ignores the details of the claims, as well as a critical element, the *location* of the license control

---

[11] Even software claims that recite functional language are patent-eligible if individual elements or the claim elements in combination claim a specific way of performing actions. *See, e.g., Finjan*, 879 F.3d at 1303 (upholding software claim written in functional language—"a first Downloadable security profile that identifies suspicious code").

mechanisms ("embedded in the digital content file"), which is neither generic nor a function. Further, the "digital content file" and "dynamic license database" are things, not functions, and each must also include specific components, as set forth in the claims.

Indeed, as Microsoft did in its case, Adobe will likely argue during claim construction that what it now calls "functions" actually should be construed to include the detailed, specific structures, methods and techniques set forth in the specification.  For example, Adobe fails to mention that in prior litigation, the District Court in Delaware construed certain claim terms to directly incorporate the specification's disclosures. The term "license monitor and control mechanism . . ." of claims 1 and 28, and a similar term in claim 31, were construed to mean "the structure described at col. 4:53-62, 13:59-14:2, 14:7-13, 14:44-15:54, 16:10-25, 17:18-23, 17:46-61, 18:61-19:5, 19:40-20:3, 23:8-24 . . . and equivalents thereof." *ViaTech Techs. Inc. v. Microsoft Corp.*, No. 14-1226-RGA, ECF No. 147 at 1-2 (June 22, 2016).[12] While the local rules envision that claim construction will occur later in this case, if means-plus-function constructions are adopted here, they would dispose of Adobe's contention that ViaTech only claims "functions." *See Paone*, 2015 WL 4988279, at *5 n.5 (considering prior Markman rulings for purposes of § 101 ruling); *see also Enfish*, 822 F.3d at 1336 (means plus function claim construed to include specific, 4-step algorithm set forth in the specification; claim not abstract).

## C.     Whether the Patent Claims Are Conventional Raises At Least A Factual Question (Step Two)

At Step Two of *Alice*, claims are patent-eligible if any individual element, or all elements together "as an ordered combination," "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*,

---

[12] Similarly, the term "adaptive fingerprint security mechanism . . ." of claim 5 and similar terms in claims 28 and 31 were construed to mean "the structure described at col. 5:4-13, 24:41-45, 24:52-25:5, 25:12-46."

881 F.3d 1360, 1367 (Fed. Cir. 2018) (citations omitted). This determination is made as of the date of the invention, and is a question of fact, on which the challenger has the burden of proof by clear and convincing evidence. *Id.* at 1368-69; *see also Berkheimer v. HP Inc.*, 890 F.3d 1369, 1370, 1371 n.3 (Fed. Cir. 2018) (en banc opinion denying rehearing) (conventionality is a "question of historical fact, not a legal question of claim scope"); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed Cir. 2019) (alleged infringer must overcome presumption of patent eligibility by clear and convincing evidence); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125-30 (Fed. Cir. 2018) (reversing grant of Rule 12(b)(6) motion where factual issues raised). Further, the mere fact that a given element may be found in the prior art does not render that element "conventional." *Berkheimer*, 881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art"). Too, the "non-conventional and non-generic arrangement of known, conventional pieces" is also patentable. *Bascom Global Internet Svcs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Regardless of the result of the Step One inquiry, Rule 12(b)(6) motions are frequently denied at Step Two because they often involve questions of fact. *Allconnect, Inc. v. Consumer Brands, LLC*, No. CV 18-5959-DOC (JDEx), 2018 WL 7377934, at *6-7 (C.D. Cal. Dec. 14, 2018) (claims including specialized database raised fact questions precluding dismissal); *XpertUniverse, Inc. v. Cisco Systems, Inc.*, No. 17-cv-03848-RS, 2018 WL 2585436, at *8 (N.D. Cal. May 8, 2018) (factual question regarding whether database system was conventional); *Pure Data Systems, LLC v. Ubisoft, Inc.*, 329 F. Supp. 3d 1054, 1066-68 (N.D. Cal. 2018) (though claims recited generic computer limitations, combination of elements raised a factual question). At the pleadings stage, the patent itself can create a factual issue requiring denial of a Rule 12(b)(6) motion. *Aatrix*, 882 F.3d at 1128 ("Whether the claim elements or the claimed combination are well-understood,

Plaintiff's Opposition to Defendant's Motion to Dismiss

routine, conventional is a question of fact.  And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").  Adobe offers no evidence beyond the Complaint and '567 patent.

The ViaTech patent stands unrebutted in its assessment and critique of the prior art systems, and its demonstration that the claimed improvements addressed those shortcomings. *Enfish*, 822 F.3d at 1337; *MAZ*, 2016 WL 5661981, at *3 (noting that a patent's critique of prior art solutions tends to show that the patented solution is not conventional). As one example only, the specification distinguishes the prior art because it did not relate protection mechanisms to individual content files. In the patent and in Claim 1, however, the protections mechanisms are *embedded in* the content files. This fact alone is sufficient to show that Claim 1 is not conventional, and requires denial of Adobe's motion.

Indeed, under Federal Circuit precedent, the location of computer tools for protecting content not only may be non-abstract, it may also be non-conventional. In *Bascom*, the patent concerned the location of an internet filtering tool to filter out undesired content. Prior art solutions placed the filtering tool at the end-user's computer, at a local server, or a remote server. The patented solution, however, placed the filtering tool at the Internet Service Provider. 827 F.3d at 1343-45. The court held that this satisfied the requirements of Step Two of *Alice*. *Id.* at 1350 ("The inventive concept described and claimed in the '606 patent is the installation of a filtering tool *at a specific location . . . .*"). Similarly, in *Amdocs (Israel) Ltd. v. Openet Telcom, Inc.*, 841 F.3d 1288, 1300-06 (Fed. Cir. 2016), the distributed location of the computer tools at issue resulted in a finding that the claims were patent-eligible under Step Two. Under both *Bascom* and *Amdocs*, the ViaTech patent satisfies the requirements for patent eligibility.

Ignoring these controlling Federal Circuit precedents, Adobe relies on the district court

decision in *Blue Spike, LLC v. Google, Inc.*, No. 14-CV-01650-YGR, 2015 WL 5260506 (N.D. Cal. Sept. 8, 2015). *See* Br. at 15. But *Blue Spike* is readily distinguishable. In a single dependent claim, the signal comparison technique claimed in other claims utilized an "embedder" to embed a unique identifier into one of the signals, an addition which the specification itself acknowledged was in the prior art and was "traditional." *Id. at* *8. The patent thus admitted the conventionality of the placement of the claimed identifier. The ViaTech patent, by contrast, states that the placement of the license control mechanisms in the DCF is *not* conventional. 3:38-45; 3:62-65. Adobe's citation to *Umbanet, Inc. v. Epsion Data Mgmt., LLC*, 263 F. Supp. 3d 647 (E.D. Tex. 2017), for the proposition that "co-location of certain licensing functions with the licensed data" is not inventive is also misplaced. Br. at 17. The patent in *Umbanet* had nothing to do with the location of a particular tool or mechanism; all the Court said was that limiting a patent to a particular field of use (email clients) did not make it inventive. *Id.* at 648-50, 653.

Beyond the location of the claimed protection mechanisms, other aspects of Claim 1 are also non-conventional. For example, in contrast to prior art systems that were only capable of implementing static licenses, or could not monitor use to ensure continuing compliance after the initial licensing, Claim 1 employs a *dynamic* license database which allows a license to be changed over time. Further, because the license is associated with the specific digital content file, it is possible to monitor subsequent or ongoing use to ensure license compliance. The patent expressly distinguishes these innovations from conventional systems.[13] Accordingly, there is at least a factual question regarding whether these innovations are "conventional," precluding a finding of

---

[13] Adobe argues that a dynamic license database is conventional (Br. at 14-15, 16). Adobe misses the point that in the ViaTech patent, the database can be *modified* after initial licensing to change the terms on which content use is licensed and monitored. The patent explains that such a mechanism was *not* conventional. 2:12-19, 58-59; 3:44-47; 37:1-55.

(continued…)

Plaintiff's Opposition to Defendant's Motion to Dismiss

patent ineligibility on Adobe's Rule 12(b)(6) motion.

Adobe's allegations that other individual elements of Claim 1 are conventional lack the necessary support to carry Adobe's burden under Step Two.  Adobe rests primarily on its own assertions or cases involving other (different) patents,[14] failing to adduce evidence of the type required to make a factual finding for this patent, much less evidence directed to 1999, the date of ViaTech's patent application. *Cf. Berkheimer*, 881 F.3d at 1369 (Step Two of *Alice* is a factual question). In an effort to support its position, Adobe references portions of the specification that discuss the prior art to conclude that the inventions were conventional. Br. at 15.  But the cited discussions of prior art systems went on to distinguish them from the invention, including through detailed recitation of the improvements afforded by innovations discussed and claimed. For example, the prior art did not employ mechanisms to monitor license compliance after initial licensing, but the patent does. 1:57-62; 2:32-36; 4:1-8 & 29-34.  Even if some prior art included a different type of control mechanism in a different location, that does not show that the claimed mechanism was "conventional." *Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art … does not mean it was well-understood, routine, and conventional.").

Finally, Adobe ignores the fact that the ViaTech patent describes the combination of elements as non-conventional. *See* 18:48-60 (the eLicense system "provides a single mechanism *for what are normally disparate functions* . . ."). While Adobe *argues* the combination is conventional (Br. at 17), it provides no evidentiary support that would be cognizable on a Rule

---

[14] *Digital Media Techs., Inc. v. Hulu, LLC*, No. 4:16cv245-MW/CAS, 2017 WL 4750705 (N.D. Fla. July 3, 2017), relied on by Adobe, was decided before the Federal Circuit's decision in *Berkheimer*, which held for the first time that Step Two was a factual question. The court in *Digital Media* cited no evidence concerning whether the individual steps were conventional, and as to the combination of steps, confused abstractness and existence in the prior art with conventionality.

Plaintiff's Opposition to Defendant's Motion to Dismiss

12(b)(6) motion, especially in the face of contradictory evidence from the patent itself.

Though the Court should find that Claim 1 is not abstract under Step One or is not "well-understood, routine and conventional" under Step Two, if the Court concludes for any reason that the specification does not raise at least a factual issue as to whether the claimed invention is non-conventional, ViaTech requests leave to file an amended complaint to allege facts demonstrating that Claim 1 (as well as other claims) are not conventional.

### D.    Other Claims Are Patentable for Additional Reasons

While Adobe asserts that all of Claims 2-32 merely add minor limitations of no patentable weight, the contrary is apparent from a reading of the claims.

Dependent claim 2 adds that the license control mechanism (LMCM) is activated *when the user attempts to access the content*. This is an improvement over prior art systems where the security protection was lifted upon installation (one-off protection). 1:61; 2:33. Adobe provides no evidence that this improvement was conventional.

Dependent claim 3 restricts access to the dynamic license library such that the user must go through the LMCM in the DCF, thereby protecting the library from unauthorized attempts to modify it. Dependent claim 4 restricts access to the digital content such that the user must go through the LMCM, thereby protecting the content from unauthorized access. These enhancements to security represent yet additional improvements, and Adobe again has no evidence that these improvements were conventional.

Claims 5 and 6 add an adaptive "fingerprint" mechanism, whereby the digital content file becomes directly associated with a specific user system, yet allows the fingerprint of the user system to be modified over time (within a range of tolerance) and for the modifications to be stored, in order to allow continued access to the content by an authorized user despite changes in the user system's configuration. The patent describes this mechanism as unconventional, and

Adobe provides no contrary evidence. 2:58-61; 5:4-31; 24:34-26:4. This mechanism is also claimed in Claims 28-32.

Claims 16 and 17 add specific ways of creating a digital content file, and specify the location (a dynamic linked library) in which control functions are to be stored. The claim also requires creating "reconstructed" executable code, encrypting the reconstructed code, encrypting the dynamic linked library, and combining the encrypted code and encrypted library with other components. The specification provides further detail on these approaches.  The novel location of the components again renders the claims non-abstract. Further, nothing in the patent indicates that this combination of steps is conventional, nor does Adobe provide any contrary evidence.

Claim 18 requires an encrypted wrapper dynamic linked library, among other requirements, which library must also include certain control functions. It also requires the extraction of critical code. Claims 22-27 require not only encrypted digital contents, but also encrypted product information, along with other features discussed above.

Adobe provides no *evidence* that any of these features, structures, or locations are conventional. All other claims not specifically mentioned above include aspects of one or more elements discussed previously that have not been shown to be conventional.

## IV.    CONCLUSION

For the reasons stated above, ViaTech requests that the Court deny Adobe's motion. With regard to oral argument, ViaTech requests oral argument to the extent it would aid the court in understanding the technology, but believes that the motions can and should be denied under controlling precedent without argument.

Dated:  August 8, 2019                    Respectfully,


VIATECH TECHNOLOGIES, INC.

By its attorneys,

*/s/ Michael Zachary*
Susan G. L. Glovsky (BBO# 195880)
susan.glovsky@hbsr.com
Lawrence P. Cogswell III, Ph,.D.
(BBO#664386)
Lawrence.Cogswell@hbsr.com
Hamilton, Brook, Smith & Reynolds, P.C.
155 Seaport Blvd.
Boston, Massachusetts  02210
Tel: (617)-607-5900
Fax: (978) 341-0136

Of counsel:

Denise M. De Mory (*pro hac vice*)
Aaron R. Hand (*pro hac vice*)
Michael Zachary (*pro hac vice*)
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
Tel.: (650) 351-7248
Fax: (415) 426-4744
ddemory@bdiplaw.com
ahand@bdiplaw.com
mzachary@bdiplaw.com

Plaintiff's Opposition to Defendant's Motion to Dismiss

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing documents filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.


_____*/s/ Michael Zachary*_____
Michael Zachary