## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VIATECH TECHNOLOGIES, INC.,

        Plaintiff,

    v.

ADOBE, INC.,

        Defendant.

Civil Action No. 20-358-RGA

MEMORANDUM OPINION

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Denise M. De Mory, Michael N. Zachary, Jennifer L. Gilbert, Richard C. Lin (argued), BUNSOW DE MORY, Redwood City, CA,

    Attorneys for Plaintiff.

Kelly E. Farnan, Sara M. Metzler, RICHARDS, LAYTON & FINGER P.A., Wilmington, DE; James F. Valentine, PERKINS COIE LLP, Palo Alto, CA; Christopher G. Hanewicz, PERKINS COIE LLP, Madison, WI; Matthew J. Moffa (argued), Thomas V. Matthew, PERKINS COIE LLP, New York, NY,

    Attorneys for Defendant.

September 14, 2023



ANDREWS, U.S. DISTRICT JUDGE:

Before the Court is Plaintiff Viatech's motions for partial summary judgment and to exclude expert testimony (D.I. 186 & 187) and Defendant Adobe's motions for summary judgment and to exclude expert testimony (D.I. 180, 181 & 182). I have considered the parties' briefing (D.I. 183, 188, 193, 196, 200, 202), and I heard oral argument on August 3, 2023 (Hearing Tr.).[1] For the reasons set forth below, Defendant's motion for summary judgment (D.I. 180) is DENIED, Plaintiff's motion for partial summary judgment (D.I. 186) is DISMISSED-IN-PART and RESERVED-IN-PART, Plaintiff's motion to exclude expert testimony (D.I. 187) is GRANTED-IN-PART, DENIED-IN-PART, and DISMISSED-IN-PART, and Defendant's motions to exclude expert testimony (D.I. 181 & 182) are GRANTED-IN-PART and DENIED-IN-PART.

## I.    BACKGROUND

Plaintiff ViaTech owns the 6,920,567 patent ("the '567 patent") which is directed towards enforcing software licenses. ViaTech asserted the same patent against Microsoft in 2014, accusing certain Microsoft Windows and Office products of infringement. *ViaTech Tech. Inc. v. Microsoft Corp.*, No. 14-CV-1226 (RGA). In *Microsoft*, I construed a number of terms of the '567 patent. One of those terms was "file," which I construed to have its plain and ordinary meaning, i.e., "a collection of data that is treated as a unit by a file system." *ViaTech Tech. Inc. v. Microsoft Corp.*, 2016 WL 3398025, *6-7 (D. Del. June 14, 2016). I later granted Microsoft's motion for summary judgment of non-infringement. *ViaTech Tech. Inc. v. Microsoft Corp.*, 2017 WL 2538570 (D. Del. June 12, 2017). ViaTech appealed my summary judgment decision as well as my construction of two terms, one of which was "file." Of relevance here, the Federal Circuit affirmed my decision

---

[1] Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. __." Citations to the transcript of the pretrial conference on September 1, 2023, also not yet docketed, are in the format "Pretrial Conference Tr. __."

granting summary judgment in favor of Microsoft and upheld my constructions, but "clarified" that a "file" may be a collection of files as claimed in the '567 patent. *ViaTech Tech. Inc. v. Microsoft Corp.*, 733 F. App'x 542 (Fed. Cir. 2018).

ViaTech then brought this case against Adobe, alleging infringement of the same patent. The parties stipulated to the same constructions as in *Microsoft*. (D.I. 86). In particular, they stipulated, "The term 'file' has its plain and ordinary meaning. The plain and ordinary meaning is 'a collection of data that is treated as a unit by a file system.' A 'file' may be a collection of files." (*Id.*).

## II.    LEGAL STANDARD

### A. Daubert

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires

that the expert testimony must fit the issues in the case. In other
words, the expert's testimony must be relevant for the purposes of
the case and must assist the trier of fact. The Supreme Court
explained in *Daubert* that "Rule 702's 'helpfulness' standard
requires a valid scientific connection to the pertinent inquiry as a
precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as
a gatekeeper, preventing opinion testimony that does not meet the
requirements of qualification, reliability and fit from reaching the
jury. *See Daubert* ("Faced with a proffer of expert scientific
testimony, then, the trial judge must determine at the outset,
pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether
the expert is proposing to testify to (1) scientific knowledge that (2)
will assist the trier of fact to understand or determine a fact in
issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote

and internal citations omitted).[2]

### B. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v.*

*New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to

permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent
amendments to it were not intended to make any substantive change.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.  DISCUSSION

### A.  The Accused Products

ViaTech has accused over 50 Adobe products of infringing the '567 patent. The common denominator of the accused products is they each include either Adobe's Application Management Technology (AMT) or its Next Generation Licensing (NGL). Both AMT and NGL perform a license check on launch of an accused Adobe application. (D.I. 183 at 7-8). AMT products confirm if a user has a valid locally stored license. If the license is expired, a display warns about the

expiration but allows the user to continue to use the application for that launch. *Id.* The AMT technology was replaced by NGL. NGL communicates with an Adobe server that contains the license information necessary for the accused product to run. (D.I. 184-1, Exhibit F at ¶ 97). Like AMT, NGL also has a user interface to communicate any license issues and performs periodic checks to ensure the most up-to-date information. (D.I. 183 at 7-8).

### B. Defendant's Motions

#### 1. Infringement

Adobe contends that ViaTech's technical expert, Dr. Madisetti, does not apply the correct claim construction for the terms "file" and "monitoring use," and that his opinions therefore must be excluded. (D.I. 183 at 27-40). Adobe argues that since Dr. Madisetti's opinions are inadmissible, there is no genuine issue of material fact and I should grant its summary judgment motion for non-infringement. (*Id.* at 40).

#### a. File

In *Microsoft*, I construed "file" as having its plain and ordinary meaning, which I set out as "a collection of data that is treated as a unit by a file system." *ViaTech*, 2016 WL 3398025, at *6-7. Based on this construction, I granted summary judgment of non-infringement because, "[p]ost-installation, Windows is a collection of files, not a single file." *ViaTech*, 2017 WL 2538570, at *4. The Court of Appeals described the issue on appeal as whether my "construction includes a collection of multiple files that is treated as a unit by a file system." *Microsoft*, 733 F. App'x at 546. The Court noted an illustrative analogy: "a large box with smaller boxes *in it* would still be considered a single package." *Id.* at 550 (emphasis added).[3] Thereafter, the Court "clarif[ied] that

---

[3] I think the analogy might be better stated as, "a large box with smaller boxes in it would still be considered a single box." This would make sense if one were construing "a single box." I am not sure how useful an analogy it is for file, since I would think the logical follow-up would be

a 'file' as claimed in the '567 patent may be a collection of files." *Id.* In view of the Court of Appeals' opinion and reasoning, I think the better way of putting the plain and ordinary meaning to the jury is that a "file" is "a collection of data or files that is treated as a unit by a file system."

As an initial matter, Dr. Madisetti states that he applies the Court's claim constructions in his analysis. (D.I. 184-1, Exhibit F at ¶ 74). In his report, Dr. Madisetti proffers six theories of infringement regarding the term "file."[4] After oral argument, ViaTech confirmed that it will not argue at trial its pre-installation theory of infringement – i.e. that .zip and .dmg files or physical media constitute a "file." (D.I. 236 at 2). Thus, that leaves five post-installation "file" theories.

ViaTech states that Dr. Madisetti will explain the basis for his opinion that the post-installation collection of files is treated as a unit by the file system by pointing to three theories: the directory structures on the end-user device (D.I. 184-2, Exhibit J at 4-5), the uninstallation process (D.I. 184-2, Exhibit J at 5-6, 9), and the single icon access point on macOS devices (D.I. 184-2, Exhibit J at 8-9). (*See* D.I. 193 at 29-33; D.I. 236).

---

that "a large file with smaller files in it would still be considered a single file." Nevertheless, since the Court of Appeals expressly modified the construction, that construction is the applicable construction.

[4] At summary judgment argument, I thought it was very unclear whether the theories being advanced were Dr. Madisetti's or counsel's. Thus, I asked Plaintiff to submit a letter outlining what the six theories were, and where Dr. Madisetti had offered opinions to support them. (Hr. Tr. at 38:25-39:11). The letter is rather underwhelming in clarifying the six theories. It cites pages 4-5, 7, and 11 of Infringement Chart 1 and pages 4-7 and 11-14 of Infringement Chart 2. (D.I. 236 at 2).

Dr. Madisetti's opening report has eleven pages of infringement analysis. (D.I. 184-1, Exhibit F at 38-48). The eleven pages do not mention any individual claim limitations. Dr. Madisetti's opening report attaches "Infringement Charts 1 and 2," which he says he relies upon. (*Id.* at 38; *see* D.I. 184-2, Exhibit J (Infringement Chart 1) (181 pages) & D.I. 185-1, Exhibit K (Infringement Chart 2) (126 pages)).

First, Dr. Madisetti explains that because the Adobe product files are organized into two directories named "Adobe," the directories are related. Adobe's expert, Dr. Wicker, explains that directories and files are distinct structures. Dr. Wicker opines that "storing files in a directory does not make them a single 'file' ... Rather, it is the individual files in a directory ... that are treated as units by a file system." (D.I. 185-1, Exhibit N at 31). Dr. Madisetti does not contradict Dr. Wicker's explanation, but rather opines that the "files relating to the operation of the product are organized in two directories within the file system" and that these directories are "related." (D.I. 184-2, Exhibit J at 5; D.I. 185-1, Exhibit K at 5). Dr. Madisetti does not explain how two distinct directories are a file or treated as a unit by a file system, but he does opine that the organization of files into the directories would meet the construction under the doctrine of equivalents. (D.I. 184-2, Exhibit J at 5; D.I. 185-1, Exhibit K at 7). Thus, Dr. Madisetti's opinions on the directory structures do not properly apply the Court's construction of "file" for literal infringement, but there is sufficient analysis under the doctrine of equivalents. For that reason, I exclude the "directory structures on the end-user's device" theory for literal infringement, but I do not exclude it under the doctrine of equivalents.

Second, Dr. Madisetti opines that the uninstall feature in Windows recognizes the various components of the Adobe product to be uninstalled as a single unit, even if they exist in different files and directories, because the various components are all erased at the same time. (D.I. 193 at 32). Adobe argues that this application of "file" is flawed because Dr. Madisetti does not explain how the products can practice the claims during uninstallation and the need for an uninstaller itself confirms that the accused products are not treated as a unit by the file system. (D.I. 200 at 17). I do not agree with Adobe that Dr. Madisetti is opining that uninstallation infringes. Rather, it seems that Dr. Madisetti is explaining that the uninstallation process shows that the various components

are a "file," and Dr. Madisetti appears to be applying the construction correctly. Whether the need for an uninstaller shows that components are or are not a "digital content file" is a factual dispute.

Third, Dr. Madisetti opines that in macOS-based systems, Adobe products and the AMT or NGL components are accessed through a single application icon, indicating that the file system treats the components as a unit. (D.I. 184-2, Exhibit J at 8-9 ("In macOS-based systems, the Adobe Product and the AMT components included with the product, including the components identified below as meeting the various elements of claim 1, are accessed through a single application icon displayed in a Finder file manager window."); D.I. 185-1, Exhibit K at 9-10 ("In macOS-based systems, the Adobe Product and the NGL components included with the product, including the components identified below as meeting the various elements of claim 1, are accessed through a single application icon displayed in a Finder file manager window."). Adobe argues that this a conclusory allegation and that Dr. Madisetti does not offer any analysis or justification for an icon to constitute a "digital content file" within the scope of the claims. Dr. Wicker opines that the icon is an operating system functionality, not a file system functionality. (D.I. 185-1, Exhibit N at 31). In his reply report, Dr. Madisetti states that for the icon, there is no material difference between the operating system and the file system but does not further explain how an icon constitutes a file. (D.I. 185-1, Exhibit Z at 4). Because Dr. Madisetti does not show sufficient support for how the single application icon meets the claim construction of "file," I will exclude this theory.

Finally, Dr. Madisetti opines that the NGL and AMT products are considered a "digital content file" because of the way the code is treated. Dr. Madisetti's NGL theory explains that the accused NGL products are "a collection of data that is treated as a unit by the file system." (D.I. 193 at 27-28). Adobe argues that Dr. Madisetti never opines that the application the NGL library is compiled into is a single file, and that, in fact, Dr. Madisetti concedes that the NGL applications

span multiple files. (D.I. 200 at 14). ViaTech, on the other hand, asserts that the source code for the license control components in these products, otherwise referred to as the "NGL library," is compiled into the Adobe application itself, and not provided as a separate file. *Id.* Thus, according to ViaTech, the digital content and license control components are part of the same compiled source code and treated as a single unit by the file system. *Id.*

Similarly, Dr. Madisetti's AMT theory explains that the AMT products are "integrated into the digital content of the Adobe product at runtime, thereby constituting a 'digital content file' at runtime. (D.I. 193 at 28). Adobe asserts that Dr. Madisetti confuses "embedded" with "file" because even if loading the code from the AMT library is "functional embedding" within the scope of the claims, it does not transform the library and executable file into a single file. (D.I. 200 at 15). ViaTech asserts that Dr. Madisetti uses Adobe's own technical documentation to show how the integration occurs and is not inconsistent with the Court's construction of "file." (D.I. 193 at 28).

I agree with ViaTech that Dr. Madisetti has properly applied the construction of "file" under these two theories. Under the Federal Circuit's clarification, a file may be a collection of files. The construction of "file" does not require that the source code be compiled into a single file as Adobe suggest, only that the collection of data is treated as a unit. Dr. Madisetti's opinions on NGL and AMT follow this construction such that the code is compiled or integrated, respectively, and the collection of data is treated as a unit within the scope of the claims. Because these theories are not inadmissible, and ViaTech has produced sufficient evidence to create a genuine dispute over whether the accused products include a "digital content file," I will deny Adobe's motion for summary judgment of non-infringement for failure to meet the "file" limitation.

### b. Monitoring Use

In *Microsoft*, I construed "monitoring use" as having its plain and ordinary meaning, which "requires surveillance or evaluation over some period of time." *ViaTech*, 2016 WL 3398025, at *11-12. Adobe states that Dr. Madisetti does not apply my construction requiring "continuously surveilling or evaluating activity over some period." (D.I. 183 at 36). As ViaTech points out, however, my construction does not require *continuous* surveillance, but rather surveillance or evaluation over some period of time. (D.I. 193 at 34). As mentioned above, Dr. Madisetti states that he applies the Court's claim constructions in his analysis. (D.I. 184-1, Exhibit F at ¶ 74).

Adobe argues that Dr. Madisetti's opinions misapply the construction of "monitoring use" in two ways. First, Adobe argues that none of Dr. Madisetti's opinions are directed to monitoring use, but rather on monitoring license validation (D.I. 183 at 37, citing D.I. 184-2, Exhibit J at 22-26; D.I. 185-1, Exhibit K at 29-30). Adobe uses the analogy of a security guard where the guard of a building checks whether an individual has a valid ID at the entrance, which is different from security cameras that monitors how the individual is using the facility. (D.I. 183 at 37).

Second, Adobe argues that Dr. Madisetti only identifies discrete license checks that occur once, despite the fact that my claim construction order in Microsoft expressly rejected ViaTech's argument that monitoring occurs only at discrete points in time. *Id.* at 37-38. Continuing the security guard analogy, Adobe argues that a security guard that only visits the building once every 24 hours to check IDs is not "continuously surveilling." *Id.* at 38.

ViaTech argues that Dr. Madisetti does properly apply the Court's construction of "monitoring use." ViaTech contends that Dr. Madisetti's opinions include analyzing the attempted usage of a product, not simply a check of license validity. (D.I. 193 at 35). ViaTech distinguishes Adobe's analogy because the accused products are not like a guard merely checking to see if an

11

individual has a valid ID. According to ViaTech, the accused products perform a more sophisticated function to see if the usage of the product complies with the information regarding the user's license. (D.I. 193 at 35). ViaTech also asserts that Dr. Madisetti opines that the accused products perform surveillance or evaluation over time based on the AMT OnIdle function and the periodic checking the AMT and NGL products perform while the product is running. (D.I. 193 at 36-38).

Expert testimony that contradicts the Court's claim construction should be excluded. *Minerva Surgical, Inc. v. Hologic, Inc.*, 2021 WL 3048447, at *9 (D. Del. July 20, 2021). Experts disagreeing about how a construction should be applied to a given case is a factual dispute for the jury. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301-02 (Fed. Cir. 2011). Here, Dr. Madisetti appears to use my construction properly. Whether AMT or NGL constitutes "monitoring use" is a factual dispute.

### 2. Damages

Adobe moves to exclude the opinions of ViaTech's damages expert, Mr. Bergman, because it contends that Mr. Bergman fails to properly apportion his reasonable royalty calculation. (D.I. 183 at 10-13). Specifically, Adobe asserts that neither of the two documents Mr. Bergman relies on for his royalty rate have been shown to have comparable built-in apportionment to a license that would have resulted from the hypothetical negotiation for the '567 patent. *Id.* at 13.

#### a. Digital River Agreement

Mr. Bergman relies on the Digital River (DR) Agreement which provided a non-exclusive license to Digital River for ViaTech's eLicense system in 1999. (D.I. 183 at 14; D.I. 184-1, Exhibit E at 67-70, 106-118). The eLicense system led to the '567 patent. (D.I. 193 at 6). The agreement included a license to package software products for sale or license to end users, as well as

ViaTech's services set forth in Attachment A in consideration of fees as listed in Attachment C. (D.I. 193 at 5; D.I. 184-1, Exhibit A, § 3). Attachment A further provided that if Digital River wanted additional services, it could pay for such services separately. *Id.* Attachment C lists the royalty rates for different licensing configurations, with royalties ranging from 0.5% to 2.0%. *Id.* Mr. Bergman opines that because of the difference in timing and the fact that Adobe would not be interested in the services provided, 0.5% would be a reasonable royalty. (D.I. 184-1, Exhibit E at 117).

Adobe argues that because the DR Agreement is not a patent license, does not include the '567 patent, and is for software technology and related services, the agreement is not an appropriate comparable license.[5] (D.I. 183 at 14). ViaTech argues that the agreement is comparable because the eLicense system licensed in the DR Agreement is technically comparable to the '567 patent and the agreement need not include the patent itself. (D.I. 193 at 10). ViaTech also argues that the apportionment is "built in" to the 0.5% rate, because the agreement "already apportions between the eLicense licensing services and other services and adjusts for the cost of Adobe's software development." (D.I. 193 at 11).

Adobe relies on *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) for its assertion that because the DR Agreement is not a patent license, Mr. Bergman may not rely on it. In that case, however, the Federal Circuit found that the expert "did not even attempt to show that these agreements embody or use the claimed technology." *Id.* at 871. Here, Mr. Bergman does

---

[5] Adobe also argues that the document is undated and unsigned. In its answering brief, ViaTech submitted a signed copy of the agreement. (D.I. 195, Exhibit A). Adobe disputed the production of the signed copy of the agreement. (D.I. 221). After hearing oral argument, Magistrate Judge Hall permitted the production of the document. (D.I. 233 at 20:5-23:12). During oral argument on the present motions, I found there was no prejudice in using the signed agreement. (Hr. Tr. at 43:1-18).

13

analyze both technological and economical comparability and makes various adjustments accounting for differences between the DR Agreement and the hypothetical negotiation.

Adobes additionally argues that Mr. Bergman's opinions are unreliable because he relies on unsupported statements from Dr. Madisetti regarding the comparability of the DR Agreement to the '567. (D.I. 183 at 17). Specifically, Adobe contends that Dr. Madisetti did not review the source code for the eLicense system and did not analyze whether the eLicense system embodied any other patents or technology. *Id.* In his report, however, Dr. Madisetti provides a claim chart comparing claim 1 of the '567 patent to the eLicense system. (D.I. 184-1, Exhibit F at 54-57).

The "ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). The Federal Circuit has instructed that district courts, as gatekeepers, should "ensure that only theories comporting with settled principles of apportionment [are] allowed to reach the jury." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). When, as here, an expert "[relies] on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). However, "the degree of comparability of the ... license agreements as well as any failure ... to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

ViaTech cites to *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 WL 4691047 (D. Del. Sept. 28, 2018). I held there that a separate apportionment analysis would not always be necessary if there were "a logical basis" for not conducting an apportionment analysis. *Id.* at *7. I found there that one of the experts had nonetheless failed to sufficiently apportion the royalty. The expert later

did provide a sufficient "logical basis," and I permitted the expert to testify. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018), *aff'd in relevant part*, 967 F.3d 1353, 1372-77 (Fed. Cir. 2020).

Mr. Bergman has clearly stated why the DR Agreement is comparable: relying on Dr. Madisetti, the eLicense system is technologically comparable to the '567 patent, Digital River operates in the same industry as Adobe and is one of Adobe's partners, and Digital River's use of the eLicense system is similar to Adobe's use of the technology to protect its software. (D.I. 184-1, Exhibit E at 68). In support of Mr. Bergman's reliance on the DR Agreement, ViaTech cites to *Cave Consulting*, where the expert relied on licenses for the commercial embodiment of the patent-in-suit instead of licenses to the patent. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 WL 4772348, at *3 (N.D. Cal. Oct. 23, 2017). This is in contrast with *Bio-Rad*, where there was reason to think that the patented technology did not play the same role in the licensed products as in the accused products. *Bio-Rad*, 2018 WL 4691047, at *8 n. 3. Mr. Bergman addresses the differences in timing, additional services, and costs of Adobe developing its own software and provides reasoning for his royalty rate. (D.I. 184-1, Exhibit E at 70). Further exploration of the similarities or differences between Adobe and Digital River is a factual, rather than methodological, exercise and can be addressed on cross examination.

### b. Intertrust Agreement

Mr. Bergman also relies on the 2007 Intertrust Agreement which gave Adobe a non-exclusive license to Intertrust's patent portfolio on digital rights management (DRM) technology. (D.I. 184-1, Exhibit E at 77-83). The patent portfolio included all Intertrust patents but does not list the patents anywhere in the agreement. (D.I. 184-1, Exhibit B at § 1.41, § 2.01). The agreement licenses Adobe's products and services for the use of Intertrust's DRM functionality and services.

(*Id.* at § 1.42, § 1.43, § 2.01). Under the agreement, Adobe agreed to pay royalties of 0.45% to 0.65%. (*Id.* at § 4.02). Mr. Bergman opines that based on the range, 0.5% would be a reasonable royalty. (D.I. 184-1, Exhibit E at 117).

Adobe argues that Mr. Bergman improperly relies on the Intertrust Agreement because it licenses possibly "hundreds" of patents, some of which are not related to digital rights management technology or comparable to the '567 patent. (D.I. 183 at 19). Adobe contends that Dr. Madisetti's technological comparability analysis, which Mr. Bergman relies on, is flawed. (*Id.* at 20). Specifically, Adobe argues that Dr. Madisetti never did a comparability analysis of the '567 patent with the Intertrust patents. *Id.* Instead, Dr. Madisetti states in one paragraph that the Intertrust Agreement is technically comparable because the products and services listed in the agreement relate to the same field of technology as the '567 patent. (D.I. 184-1, Exhibit F at 53). Adobe further argues that the Intertrust Agreement is directed towards a broad range of DRM technologies, which is a vastly different scenario than the hypothetical negotiation for licensing the '567 patent which is directed to a specific and narrow digital rights system. (D.I. 183 at 22).

ViaTech argues that Adobe does not properly support its position that the '567 patent is narrow in scope or that the Intertrust Agreement is directed to broad DRM technology. (D.I. 193 at 18). In addition, ViaTech contends that because the Intertrust Agreement and the hypothetical negotiation involve DRM technology, they are directed to the same goal and involve patents in the same field, making the Intertrust Agreement comparable. (*Id.* at 19).

"[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc*, 632 F.3d at 1317. It is improper to "rely on license agreements that were radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Id.* at 1316 (internal quotation marks omitted).

"[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted). As stated above, "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. "The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded." *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F.Supp.2d 999, 1022 (S.D. Cal. 2011).

ViaTech relies on *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030 (Fed. Cir. 2020) for its contention that Mr. Bergman's opinions are admissible. Although *Vectura* involved a portfolio of patents, it is inapposite. In that case, the license and the hypothetical negotiation were "highly comparable," such that defendant's own expert conceded that the license was comparable. *Id.* at 1040. Plaintiff's expert also analyzed the patents from the portfolio, presented evidence that the "key component" was allowing defendant to use plaintiff's invention, and the license was between the same parties to the litigation. *Id.* at 1041.

Here, ViaTech has not identified the number of patents in the licensed portfolio or compared any single patent that would be covered by the Intertrust Agreement to the '567 patent. Adobe has asserted that there are "hundreds" of patents included in the agreement. (D.I. 183 at 19). While Adobe's expert did count the number of patents covered by the agreement, he does not mention the number in his report. (Hr. Tr. at 52:8-53:3). As such, there is no record of how many patents are encompassed by the Intertrust Agreement. It is ViaTech's burden to show comparability of the Intertrust Agreement. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009). Dr. Madisetti does not do any comparability analysis of any Intertrust

patents with the '567 patent. Adobe's expert, Dr. Wicker, on the other hand, does opine that at least two patents from the Intertrust Agreement are not related to the field of digital rights management. (D.I. 185-1, Exhibit N at 39).

Adobe relies on *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900 (Fed. Cir. 2022), *cert. denied,* 143 S. Ct. 2561 (2023), in which the Federal Circuit found that the technical expert did not adequately establish technological comparability between the asserted patent and the licensed patents. There, the licenses at issue "involved hundreds or thousands of patents that spanned a broad range of technologies." *Id.* at 915. While the Intertrust Agreement may not have as many patents and does not span a broad range of technologies, it does involve the broad category of DRM technology with an untold number of patents. "The party proffering a license bears the burden of establishing it is sufficiently comparable to support a proposed damages award." *Adasa*, 55 F.4th at 915. Mr. Bergman's brief explanation on the patents "likely" encompassed by the Intertrust Agreement does not sufficiently establish comparability to support his opinions because there is no evidence or analysis of the patents in the portfolio. (*See* D.I. 184-1, Exhibit E at 82).

### 3.  Mr. Bergman's Citation of Large Numbers

Adobe argues that Mr. Bergman's use of large dollar values that are not specific to the '567 patent, the accused products, or Adobe should be excluded. (D.I. 183 at 24-25). Specifically, Adobe argues that Mr. Bergman's use of billion-dollar figures in relation to the software industry, including how much the industry is worth (D.I. 184-1, Exhibit E at ¶ 51), the estimated cost of piracy theft (D.I. 184-1, Exhibit E at ¶¶ 71-74, 135, 137-142) and Adobe's revenue (D.I. 184-1, Exhibit E at ¶¶ 94-95, 98-99), is more prejudicial than probative. (D.I. 183 at 25).

Neither the value of the software industry as a whole nor Adobe's revenue are relevant to the facts of this case. These figures have no probative value on any disputed issue.[6] As the Federal Circuit has noted, using the entire market value of the accused products where the patent does not create the basis for customer demand and disclosing the company's related revenue "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc*, 632 F.3d at 1320. The parties have also already been directed to conceive of another way to refer to the percent of damages ViaTech is seeking in relation to Adobe's revenue so as to not unfairly prejudice Adobe. (Pretrial Conference Tr. at 115:4-119:10). Therefore, I will exclude these paragraphs of Mr. Bergman's report.

Regarding the cost to the software industry due to piracy theft as of the time of the invention, such a number is not unfairly prejudicial to Adobe, but rather outlines a consideration relevant to obviousness, and I will not exclude Mr. Bergman's opinion on the historical cost of piracy theft.

### 4. Mr. Bergman's Use of Forward Citations

Adobe moves to exclude Mr. Bergman's statements on forward citations because they do not fit the facts of this case. (D.I. 183 at 25). Adobe argues that Mr. Bergman does no forward citation analysis and gives no context for the forward citations. (D.I. 183 at 25-26). ViaTech argues that Mr. Bergman does not rely on the forward citations for his royalty rate and only uses them as a "data point" to show recognition by the industry that the '567 patent is in the field of digital rights management. (D.I. 193 at 21).

Mr. Bergman states the following regarding forward citations:

---

[6] Even if these large numbers had some marginal relevance to a disputed issue, I would exclude them under Federal Rule of Evidence 403.

> As of the date of this report, the '567 patent has been cited 314 times by either a third party or a patent examiner during the course of prosecution of patent applications submitted by third parties. Cited companies include International Business Machines ("IBM"), Sony Corporation, LG Electronics, Samsung Electronics Co., Ltd., Yahoo! Inc., Symantec Corporation, Cisco Technology, Inc., Microsoft Corporation, Google Inc., and Intel Corporation. Adobe patents cited the '567 patent three times, Intertrust patents cited the '567 patent two times, and Macrovision cited the '567 patent one time.

(D.I. 184-1, Exhibit E at 18-19). Mr. Bergman does no analysis to a specific comparable license and does not tie the forward citations to the facts of this case. *See, e.g.*, *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at *2 (D. Del. Sept. 4, 2019). Further, as Adobe points out, there is no dispute that the patent is in the field of digital rights management. (D.I. 200 at 11). At the very least, this analysis should be excluded under Federal Rule of Evidence 403. Thus, I will exclude Mr. Bergman's opinions on forward citations.

### 5. Mr. Bergman's Reliance on an Industry Study

Finally, Adobe moves to exclude Mr. Bergman's citations and opinions regarding an article by Thomas Varner to support an award of a running royalty rate. According to Mr. Bergman, the Varner article found "that only 2% of bare patent licenses were in the form of a lump sum royalty. When including settlement agreements, that number was still only 10%." (D.I. 184-1, Exhibit E at 115). This is a general economic study that is not relevant to the facts of this case. Mr. Bergman does not perform any analysis of the article or tether it to any of the facts in this case, and I will exclude both the Varner article and Mr. Bergman's opinions on it.

### C. Plaintiff's Motions

### 1. Summary Judgment

ViaTech moves for summary judgment on Adobe's asserted defenses of license, waiver, estoppel, and unclean hands. (D.I. 188 at 3). Adobe states that it does not intend to pursue the

defenses of license, waiver, or unclean hands. (D.I. 196 at 33). ViaTech's motion on these defenses are therefore dismissed as moot.

On the defense of estoppel, Adobe contends that it does not intend to argue that ViaTech is estopped from its infringement claim, but that Adobe must be able to apply the doctrine of prosecution history estoppel in case ViaTech attempts to extend its claims to subject matter it disclaimed in prosecution under the doctrine of equivalents. (*Id.* at 33). Adobe points to interrogatory responses on its estoppel defense and non-infringement as adequately raising the defense. (*Id.* at 34). ViaTech argues that Adobe's responses are non-infringement arguments and that Adobe has not identified any doctrine of equivalents arguments for which prosecution history estoppel would apply. (D.I. 202 at 13-14).

"[P]rosecution history estoppel [] is 'to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict.'" *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009) (citing *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8 (1997)). Here, Adobe only points to non-infringement contentions for its NGL product to support its assertion that prosecution history estoppel must apply. Adobe points to one doctrine of equivalents argument for "digital content file," but this does not appear to be the claim element for which Adobe seeks to assert prosecution history estoppel. (D.I. 196 at 35). Instead, the disclaimed subject matter relates to the "file access control mechanism," for which ViaTech does not have a doctrine of equivalents theory and Adobe only cites to its non-infringement contentions. (*Id.* at 33, citing *Viatech*, 2016 WL 3398025, at *8). Further, as ViaTech points out, Adobe's expert does not opine on any prosecution history estoppel in response to any of ViaTech's other doctrine of equivalents theories. While there does not seem to be any evidence

that Adobe could argue prosecution history estoppel, I will reserve judgment on this issue until the close of evidence and after the jury verdict.

### 2. Dr. Wicker's Non-Comparability Opinions

ViaTech argues that Dr. Wicker's opinions regarding the non-comparability of the Intertrust patents should be excluded because they are conclusory. (D.I. 188 at 6). Because I have excluded the Intertrust Agreement as a basis for the royalty rate, *supra* III.B.2.b, this motion is dismissed as moot.

### 3. Dr. Mody's Damages Opinions

ViaTech argues that a number of Dr. Mody's opinions should be excluded because they are unreliable. (D.I. 188 at 8). Specifically, ViaTech asserts that Dr. Mody relies on unsupported technical opinions (*id.* at 9-16), unsuccessful and irrelevant attempts to monetize the '567 patent (*id.* at 16-20), and other irrelevant facts relating to ViaTech's size and condition and the Microsoft settlement agreement (*id.* at 20-21).

#### a. Dr. Mody's Reliance on Technical Opinions

ViaTech argues that Dr. Mody used unreliable and unsupported technical opinions as a basis for her opinions on non-infringing alternatives, what the patent is "directed to," the success of Adobe's products, the Intertrust agreement, and the psychology of large numbers. (D.I. 188 at 9-16). Because I have already excluded the Intertrust Agreement, *supra* III.B.2.b, ViaTech's motion regarding Dr. Mody's opinions on it is moot.

Similarly, I have excluded ViaTech's expert's use of large numbers in relation to the software industry and Adobe's revenue, *supra* III.B.3, and ViaTech's motion regarding Dr. Mody's opinions on it is therefore also moot. Regarding the cost to the software industry due to piracy theft, Dr. Mody's opinions do not relate to the cost and do not fit the facts of the case.

Instead, Dr. Mody cites to an article from the 1970s and a Federal Circuit case opining that juries can be affected by the large numbers in damages awards. (D.I. 197-1, Exhibit BB at ¶ 73). The probative value of a 1970's article and a Federal Circuit opinion to disputed issues in this case is essentially zero, and is substantially outweighed by the danger of wasting time and confusing the jury with at best marginally relevant information.  Fed. R. Evid. 403.

ViaTech argues that Dr. Mody bases her opinions on non-infringing alternatives on a conversation she had with Dr. Wicker on the technical feasibility of the non-infringing alternatives. (D.I. 188 at 9; *see* D.I. 197-1, Exhibit BB, ¶ 52). According to ViaTech, Dr. Mody acts as a "mouthpiece" for Dr. Wicker since Dr. Wicker did not address non-infringing alternatives in his report. (D.I. 188 at 11). In addition, ViaTech contends that Dr. Mody makes assumptions that there "must be" non-infringing alternatives because ViaTech has not sued any other company other than Microsoft and that Dr. Mody makes assumptions about ViaTech licensee Electronic Arts that "has never used" the patent, implying that Electronic Arts' digital rights management system is a non-infringing alternative. (*Id.* at 13-14).

"As a general matter, there is nothing wrong with such a practice in the instant context— in patent cases, damages experts routinely rely on facts and opinions provided by technical experts when rendering their damages analysis." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12731924, at *6 (D. Del. Nov. 4, 2015). This reliance is typically not improper because the technical expert's underlying opinions are of record in the case and can be reviewed by the fact-finder and cross-examined by the opposing party. *Id.*

Here, the issue is that Dr. Wicker's expert report contains no opinions on non-infringing alternatives. Therefore, Dr. Wicker will not be able to testify on any non-infringing alternatives and ViaTech should not be put in the position of considering whether to examine him on opinions

he has not offered.  Adobe argues that Dr. Mody's opinions on non-infringing alternatives were disclosed in advance of Dr. Wicker's deposition, and ViaTech had the opportunity to depose Dr. Wicker on this topic. (D.I. 196 at 7). But ViaTech is not required to lend Adobe a helping hand by questioning Adobe's expert on issues he has not expressed or explained and is otherwise precluded from expressing at trial. Thus, I will not permit Dr. Mody to testify to what she says Dr. Wicker said to her in conversation. She would simply be repeating what Dr. Wicker told her, all of which is outside her expertise. It would amount to unfairly prejudicial and admissible hearsay. *W.L . Gore*, 2015 WL 12731924, at *5-7 (finding that patentee's damages expert's opinion that certain license agreements were technologically comparable to the asserted patents relied on conversations she had with the patentee's technical expert, and not her own knowledge, but the technical expert had not included those opinions on comparability in his report, and thus the damages expert's opinion was not properly supported).[7]

Rule 703 allows an expert to base an opinion on "facts or data" of which "the expert has been made aware" if experts in the field would reasonably rely upon them.  But that does not automatically mean the expert can then provide the "facts" to the jury.  Here, the underlying facts are themselves expert opinions of Dr. Wicker which he has not disclosed in compliance with the rules.  I do not think Defendant should be able to get in through the back door what it cannot get in through the front door.  In my opinion, the non-infringing alternatives opinions are not shown to be reliable. Dr. Mody may not disclose them to the jury, as their probative value in helping the

---

[7] In *W.L. Gore*, the Court did not strike the damages opinion and allowed the technical expert to supplement his report to provide the technical opinions and made available for deposition. Adobe makes a similar request here. (D.I. 196 at 7). In *W.L. Gore*, however, the Court noted that the supplemental report would be a "short addendum," and the equities favored a supplemental report. *W.L. Gore*, 2015 WL 12731924, at *7. A supplemental report on non-infringing alternatives is unlikely to be a short addendum and the equities do not favor a supplementation two days before trial.

jury evaluate Dr. Mody's damages opinions does not substantially outweigh the prejudicial effect of putting unreliable expert opinions to the jury.  Therefore, I will exclude Dr. Mody from testifying about what Dr. Mody told her about non-infringing alternatives.

Next, ViaTech argues that Dr. Mody improperly offers an opinion on what the '567 patent is "directed to" based on conversations with Dr. Wicker. (D.I. 188 at 14). Specifically, ViaTech takes issue with Dr. Mody opining that the patent is not directed toward piracy. *Id.* Adobe argues that Dr. Mody may permissibly rely on conversations with Dr. Wicker, and Dr. Wicker expressly discusses what the '567 patent is directed to in his report. (D.I. 196 at 10-11). Adobe also contends that ViaTech's own expert has conceded that the '567 patent does not mention piracy. (*Id.* at 11).

Unlike the issue concerning non-infringing alternatives, Dr. Wicker has opined on what the '567 patent is directed to in his report. (D.I. 185-1, Exhibit 1 at 13-26). Therefore, Dr. Wicker may testify on this topic at trial, and Dr. Mody may base her testimony on Dr. Wicker's opinions whether he testifies about them at trial or not. Whether the '567 patent is directed to piracy is a factual dispute that is best addressed through cross-examination. Therefore, I will not exclude Dr. Mody's testimony on what the '567 patent is directed to.

Finally, ViaTech argues that Dr. Mody offers opinions about the success of Adobe's NGL technology compared to its AMT technology without any support from Dr. Wicker or otherwise. (D.I. 188 at 15). ViaTech contends that Dr. Mody is not a technical expert and therefore cannot opine on the contribution of the '567 patent to NGL or on the nexus of the patent to the success of the technology. *Id.* Adobe argues that Dr. Mody is not opining on the underlying technology, but rather on the success of NGL and AMT in the market. (D.I. 196 at 11-12). According to Adobe, Dr. Mody is responding to Mr. Bergman's opinions and his alleged failure to distinguish NGL from AMT based on their respective business models. (*Id.* at 12).

I agree with Adobe. Dr. Mody appears to be opining on the commercial success of NGL versus AMT in response to Mr. Bergman's opinions, not necessarily on the underlying technologies that may have made NGL more successful. Specifically, Dr. Mody relies on deposition testimony and the marketing models of the two technologies, not the technologies themselves. (*See* D.I. 197-1, Exhibit BB at ¶¶ 102, 110, 116). Therefore, I will not exclude Dr. Mody's opinions relating to the economic success of the NGL and AMT technology.

### b.  Dr. Mody's Damages Opinions

ViaTech moves to exclude Dr. Mody's affirmative damages opinions which are based on ViaTech's unsuccessful attempts to sell and license the '567 patent. (D.I. 188 at 16).

First, ViaTech argues that its transactions with monetization entities are irrelevant. (*Id.* at 17). In particular, Dr. Mody discusses ViaTech's transactions with Acacia, IP Nav, Tejas, Proqlaim, and Random Perspectives. (D.I. 197-1, Exhibit BB at ¶¶ 27, 32-33, 37-38). In these transactions, if they had been consummated, the patent monetization entity would monetize the patent, and ViaTech would receive a share. (D.I. 188 at 17). ViaTech argues that because the proceeds would be split between ViaTech and another company, both ViaTech and the third party would be on the same side of the table, and the transactions do not place a value on the patent. (D.I. 202 at 7).

Adobe argues that these transactions establish the value ViaTech placed on the patent. (D.I. 196 at 20). According to Adobe, because the patent monetization entity is attempting to license or sell the patent, it considers the same economic factors as a patentee and alleged infringer during a hypothetical negotiation. *Id.*

Both ViaTech and Adobe cite to *In re ChanBond, LLC Pat. Litig.*, 2020 WL 550786 (D. Del. Feb. 4, 2020). ViaTech argues that *ChanBond* supports exclusion of the transactions with the

monetization entities because "it is an agreement between two parties who want to be on one side of that transaction, that of the licensor." *Id.* at *2. As Adobe points out, however, *ChanBond* is not applicable here. In *ChanBond*, I excluded the transactions the expert relied upon because they occurred at the time of or after the suit was filed and valued the litigation itself, not the patents-in-suit. Here, the transactions occurred a decade before the suit was filed and were contemporaneous with the hypothetical negotiation date.

Nevertheless, the transactions with the monetization companies do not appropriately value the '567 patent and Dr. Mody does not account for the recovery sharing between the entity and ViaTech. For example, the agreement between ViaTech and Acacia states that Acacia would provide ViaTech an initial payment of $125,000 and 50% of any net proceeds from enforcement. (D.I. 197-1, Exhibit II at §§ 3.1-3.2). Similarly, ViaTech proposed a patent purchase agreement with Tejas Research in which ViaTech would receive $750,000 and 10% of any additional payments Tejas may receive. (D.I. 197-2, Exhibit PP at §§ 2.1-2.2). In the agreement with ProQlaim, ViaTech was to receive 45% of any profit generated from the "enforcement, assignment, licensing, commercialization, exploitation, use, practice; and/or sale." (D.I. 197-2, Exhibit QQ at § 2.1). These agreements and offers do not show what ViaTech valued the '567 patent at during the time of the hypothetical negotiation. At best, they show that ViaTech valued the '567 patent at something greater than the initial payments, i.e., the initial payment plus whatever profit the patent generates. Dr. Mody does not discuss the revenue sharing aspect in her report or take into account that these offers include additional payments after the initial payment. Therefore, I will exclude Dr. Mody's opinions on transactions with Acacia, IP Nav, Tejas, Proqlaim, and Random Perspectives..

Second, ViaTech argues that its efforts to sell or license the '567 patent through IPOfferings is irrelevant because it was unsuccessful and Dr. Mody does not take into account the differences in those offers and the hypothetical negotiation. (D.I. 188 at 17-18). ViaTech contends that unconsummated licenses are of little probative value and Dr. Mody does not take into account the assumptions of validity and infringement. (*Id.* at 18). ViaTech cites to *SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480 (E.D. Tex. 2013), for its contention that the successful sale of a patent may be irrelevant to a hypothetical negotiation. (D.I. 188 at 18). In *SSL*, however, the Court allowed the expert to testify on the sale and valuation of a patent portfolio and the jury heard evidence of the different circumstances under which that sale occurred. *SSL Servs.*, 940 F. Supp. 2d at 490. Similarly, ViaTech is free to introduce evidence that the circumstances surrounding the offers made through IPOfferings were under different circumstances than a hypothetical negotiation and the jury may weigh that evidence.

The fact that Dr. Mody did not specifically address assumptions of validity and infringement in connection with IPOfferings is not a reason to exclude offers made through IPOfferings. In fact, Dr. Mody does assume that the asserted claims are valid, enforceable, and infringed for the purposes of her analysis, which is all that she is required to do. (D.I. 197-1, Exhibit BB at ¶ 7). I have noted before that license agreements frequently do not have certainty regarding infringement and validity, but they can still inform a reasonable royalty calculation. *Robocast, Inc. v. Microsoft Corp.*, 2014 WL 202399, at *3 (D. Del. Jan. 16, 2014); *see also ResQNet.com*, 594 F.3d at 872 ("[A] reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages rather than agreeing to a reasonable royalty.")(internal quotation marks omitted); *Mondis Tech, Ltd. v. LG Electronics, Inc.*, 2011 WL 2417367, at *4 (E.D. Tex. June 14, 2011) (allowing tripling of standard royalty rates to account for uncertainty). It is up to

28

the jury to determine the weight of Dr. Mody's damages calculation based on the agreement with IPOfferings, and therefore I will not exclude it.

Finally, Dr. Mody opines that ViaTech was unsuccessful in monetizing, selling, or licensing the '567 patent. (D.I. 197-1, Exhibit BB at ¶¶ 26-38). While ViaTech's offers to sell the '567 patent are relevant to Dr. Mody's damages opinions, since they represent ViaTech's placement of a value on owning the patent, the fact that ViaTech was unsuccessful is irrelevant and would be unfairly prejudicial. Any reference to ViaTech's failure to sell or license the patent are excluded.[8]

### c.   ViaTech's Size and Financial Condition

ViaTech moves to preclude Dr. Mody from testifying on ViaTech's size and financial condition. During the pretrial conference, Adobe stated that it would not bring up ViaTech's financial condition or any financial failures. (Pretrial Conference Tr. at 85:7-88:15). Therefore, I will dismiss this motion as moot.

### d.   ViaTech's Settlement Agreement with Microsoft

ViaTech moves to exclude Dr. Mody's opinions on the settlement agreement between ViaTech and Microsoft, which was entered into in 2021. (D.I. 188 at 21-22). ViaTech argues that the agreement is irrelevant and Dr. Mody does not opine that the agreement is comparable. *Id.* Adobe argues that settlement agreements can be relevant to patent damages and because the patent in the settlement agreement was the same and ViaTech was also a party to the settlement agreement, the agreement is relevant here. (D.I. 196 at 28-29).

---

[8] I expect the jury will figure out that the offers to sell were unsuccessful. But no witness or attorney should state this and no attorney should make any argument that suggests this to the jury.

While "there is no per se rule barring reference to settlements simply because they arise from litigation," *AstraZeneca AB v. Apotex*, 782 F.3d 1324, 1336 (Fed. Cir. 2016), the Federal Circuit has noted the "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages." *LaserDynamics, Inc.*, 694 F.3d at 77. Similarly, this Court has observed, "Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances." *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016). There is generally minimal probative value in using litigation settlement agreements to calculate a reasonable royalty, as a settlement agreement is not comparable to a negotiation between two willing parties. *See Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (excluding license agreements resulting from litigation for lack of comparability). Dr. Mody does not opine that the agreement is comparable. Only Adobe makes that argument. And, as is the case here, the minimal probative value "is even less, where, as here, the settlement agreements occurred years after the hypothetical negotiation." *ePlus, Inc. v. Lawson Software*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012). As there is little probative value in the settlement agreement in informing a hypothetical negotiation, Dr. Mody's report and testimony will be excluded to the extent that it relies on the Microsoft settlement agreement.

### 4.   Mr. Rosenblatt's Personal Knowledge of Prior Art

ViaTech moves to exclude Mr. Rosenblatt's testimony regarding his personal knowledge of certain prior art system references that he relies on for his invalidity opinions. (D.I. 188 at 22). Citing to the *Pennypack* factors, ViaTech argues that because Mr. Rosenblatt was not disclosed as an individual with relevant knowledge, as required by Federal Rule of Civil Procedure 26(a), which prejudices ViaTech and the prejudice cannot be cured. (*Id.* at 23).

Adobe argues that the prior art system references that Mr. Rosenblatt has personal knowledge of have been a part of this case from the beginning. (D.I. 196 at 31). As such, ViaTech had the full opportunity to investigate the references, including asking Mr. Rosenblatt about his personal knowledge during his deposition, but chose not to do so. (*Id.*; Hr. Tr. at 89:2-9). Adobe cites to *United States of America v. Gilead Sciences, Inc.*, where the Court found that any surprise could be cured because defendant would have the opportunity to depose the expert about his personal experience. C.A. No. 1:19-cv-02103-MN-CJB, D.I. 319 (D. Del. July 11, 2022).

I agree with Adobe. As an initial matter, the scheduling order in this case states that "[i]f any party believes that an expert report does not comply with the rules relating to timely disclosure or exceeds the scope of what is permitted in that expert report, the complaining party must notify the offending party within one week of the submission of the expert report." (D.I. 59 at ¶ 10). ViaTech waited until the dispositive motions deadline, months after Mr. Rosenblatt's report was served, to raise an objection. Thus, ViaTech's objection is forfeited.

In the alternative, I consider the *Pennypack* factors to determine whether the failure to disclose should result in exclusion of the evidence. Courts in the Third Circuit consider: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). "[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Pennypack*, 559 F.2d at 905 (quoting *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96,

99 (3d Cir.1977)). The determination of whether to exclude evidence is within the discretion of the district court. *Id.*

ViaTech is neither surprised nor prejudiced by Mr. Rosenblatt's opinions because it knew about the prior art system references early in the case and had a full opportunity to question Mr. Rosenblatt on his experiences during his expert deposition. The fact that it chose not to do so does not warrant the "extreme sanction" of exclusion. Nor was Adobe acting in bad faith or willfully failing to disclose evidence as it disclosed the prior art systems in accordance with the scheduling order. Therefore, I will not exclude Mr. Rosenblatt's testimony on his personal knowledge of the prior art system references.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (D.I. 180) is DENIED, Plaintiff's motion for partial summary judgment (D.I. 186) is DISMISSED-IN-PART and RESERVED-IN-PART, Plaintiff's motion to exclude expert testimony (D.I. 187) is GRANTED-IN-PART, DENIED-IN-PART, and DISMISSED-IN-PART, and Defendant's motions to exclude expert testimony (D.I. 181 & 182) are GRANTED-IN-PART and DENIED-IN-PART.

An appropriate order will issue.